**[Cite as *In re A.S.*, 2025-Ohio-2621.]**

| | | |
|---|---|---|
| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

IN RE: A.S.
      S.S.

C.A. Nos.    24CA012194
                25CA012209

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF LORAIN, OHIO
CASE Nos.   23JC65767
              23JC65768

DECISION AND JOURNAL ENTRY

Dated: July 28, 2025

STEVENSON, Presiding Judge.

{¶1} Appellants, T.D. ("Mother") and G.S. ("Father"), appeal from a judgment of the Lorain County Court of Common Pleas, Juvenile Division, that terminated their parental rights and placed their two minor children in the permanent custody of Lorain County Children Services ("LCCS"). This Court affirms.

I.

{¶2} Mother and Father are not married but have lived together as a couple for several years. They are the biological parents of the children at issue in this appeal: twin daughters, A.S. and S.S., born November 2, 2022. Mother has four older children who were removed from her custody in prior juvenile cases. The three oldest children were not returned to Mother's custody but were ultimately placed in the legal custody of paternal relatives.

{¶3} Mother's fourth child, J.B., born April 26, 2013, was removed from her custody in a 2018 juvenile case. The child was adjudicated abused, neglected, and dependent, based on physical abuse of the child and Mother's untreated mental health diagnoses. Father, who is not J.B.'s father, was believed to be the perpetrator of the abuse. It was never confirmed that Father had abused the child, but no one else was identified as a potential perpetrator. Although LCCS did not believe that Mother had harmed J.B., the agency remained concerned throughout that case that Mother would not be able to protect J.B. from future abuse because she continued to live with Father and insisted that he had not harmed the child. During December 2019, the juvenile court terminated Mother's parental rights to J.B. and placed the child in the permanent custody of LCCS.

{¶4} A.S. and S.S. were born less than three years later and resided with Mother and Father for the first two months of their lives. On January 14, 2023, the parents took two-month-old A.S. to the hospital to treat an injury to her left leg. A medical examination of the child revealed that she had a broken femur, as well as numerous rib fractures in various stages of healing. Due to the nature and extent of A.S.'s injuries, and concerns that she might have been abused, the hospital consulted a pediatric child abuse specialist at Akron Children's Hospital, Dr. McPherson. He also examined S.S. and determined that she had a femur fracture of one leg, a tibia fracture of the other leg, and numerous rib fractures, which had occurred at different points in time.

{¶5} Dr. McPherson spoke to each parent while the children were hospitalized but did not believe that their explanations were consistent with the children's injuries. Regarding A.S.'s recent femur fracture, each parent stated that, during a diaper change, Father had quickly grabbed the child's leg to prevent her from falling off the couch. Father stated that he heard a snap and knew something was wrong, so they sought emergency medical treatment. Both parents denied any other traumatic injuries to either child. Their explanation for the rib fractures was that they

might have swaddled the children too tightly or held them too closely together. They offered no explanation for the tibia fracture of S.S. According to Dr. McPherson, the leg fractures of S.S. would have caused the child significant pain for many days, which would have been apparent to the child's caregivers.

{¶6} Mother and Father offered no other explanations for the children's injuries and continued to insist that neither of them had intentionally harmed either child. After extensive examinations and medical testing of the children by multiple medical specialists, Dr. McPherson ruled out potential accidental or underlying medical causes for the children's injuries and determined that each child had been physically abused on multiple occasions.

{¶7} During their discussions with Dr. McPherson and an LCCS intake caseworker, the parents continued to deny that either of them had abused A.S. and/or S.S., yet they insisted that they were the only people who had provided care for the children. Because the parents refused to work on a voluntary safety plan, LCCS filed complaints to allege that the children were abused, neglected, and dependent.

{¶8} At the adjudicatory hearing before a magistrate, LCCS presented the testimony of Dr. McPherson and the intake caseworker. Mother and Father each testified on their own behalf, again insisting that they had been the children's sole caregivers but had never abused them. They continued to offer similar implausible explanations for the children's injuries. After the hearing, the magistrate adjudicated the children abused, neglected, and dependent.

{¶9} Pertaining to the adjudication of abuse and neglect, the magistrate explicitly focused on the testimony of Dr. McPherson, who had ruled out other potential causes of the children's extensive injuries, including the explanations offered by the parents, and concluded that someone had physically abused each child at multiple points in time. The magistrate also

emphasized the parents' testimony that they had been the children's sole caregivers and no one else had been left alone with them. Consequently, the magistrate implicitly found that each parent had either physically abused A.S. and S.S. or neglected them by failing to protect them from ongoing physical abuse by the other parent.

{¶10} The trial court adopted the magistrate's decision and neither parent objected. Following a dispositional hearing, the trial court placed the children in the temporary custody of LCCS. They did not challenge the adjudication and initial disposition of the children through timely objections and/or an appeal to this Court. *See In re D.T.*, 2014-Ohio-2332, ¶ 25 (9th Dist.). Therefore, the case proceeded based on the unchallenged and conclusive adjudications of abuse, neglect, and dependency of each child. *See In re H.F.*, 2008-Ohio-6810, ¶ 18.

{¶11} The case plan in this case required Mother and Father to demonstrate that they could provide A.S. and S.S. with a safe and appropriate home. To accomplish that reunification goal, in addition to demonstrating that they had stable income and housing, each parent was required to engage in mental health treatment and parenting classes; attend weekly, supervised visits with the children; and demonstrate that they could appropriately meet the children's needs for supervision and nurturing care without becoming physically or verbally abusive.

{¶12} During May 2023, however, Mother and Father were indicted on numerous counts of felony child endangering. Shortly after they were indicted, the criminal court issued no contact orders that prohibited them from having any contact with A.S. and S.S. Consequently, after three months of supervised visits with their infant twins, the parents were not permitted to visit the children or engage in parenting classes with them for the remainder of this case.

{¶13} On January 12, 2024, LCCS moved for permanent custody of A.S. and S.S., alleging that permanent custody was in their best interest and that they could not or should not be

returned to the custody of their parents based on numerous grounds set forth in R.C. 2151.414(E), including that they had failed to remedy the conditions that caused the children's removal; they demonstrated a lack of commitment to the children; and they abused the children or neglected them by allowing them to suffer abuse under circumstances demonstrating that it would not be safe to return the children to their parents' home. *See* R.C. 2151.414(B)(1)(a); 2151.414(E)(1); 2151.414(E)(4); 2151.414(E)(15). The parents alternatively requested a six-month extension of temporary custody so they could have time to resolve their criminal charges and work on the case plan.

{¶14} The permanent custody hearing commenced on August 26, 2024. Although LCCS had alleged multiple first prong grounds for permanent custody, it focused its evidence primarily on the ground that it alleged under R.C. 2151.414(E)(15), that the parents had abused the children or neglected them by allowing them to suffer abuse and that reunification with the parents would threaten the children's safety because of "the seriousness, nature, or likelihood of recurrence of the abuse or neglect[.]" LCCS presented the testimony of several witnesses. Although the agency also called Mother and Father to testify, they asserted their Fifth Amendment privilege against self-incrimination because the criminal charges against them were still pending. The trial court accepted their assertions of privilege and excused each parent from the witness stand. The parents did not present any witnesses on their own behalf.

{¶15} Following the hearing, the trial court terminated parental rights and placed A.S. and S.S. in the permanent custody of LCCS. Father and Mother appeal and raise a total of four assignments of error, which will be consolidated and/or rearranged to facilitate review.

II.

## FATHER'S ASSIGNMENT OF ERROR I

THE COURT DENIED FATHER'S RIGHT TO DUE PROCESS WHEN [IT] DID NOT GRANT FATHER'S MOTION FOR AN EXTENSION OF TEMPORARY CUSTODY[.]

## MOTHER'S ASSIGNMENT OF ERROR II

THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT REJECTED MOTHER'S ARGUMENT THAT THE CIRCUMSTANCES OF THIS CASE WARRANT A FIRST EXTENSION OF TEMPORARY CUSTODY TO LCCS BECAUSE A PENDING CRIMINAL ACTION PREVENTED LCCS FROM PERFORMING REASONABLE REUNIFCATION EFFORTS, AS IT IS LIKELY THAT REUNIFCATION CAN OCCUR. THE TRIAL COURT'S FINDING THAT IT IS IN THE BEST INTEREST OF THE CHILDREN TO GRANT PERMANENT CUSTODY TO [LCCS] IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶16} Through Father's first and Mother's second assignments of error, they assert that, rather than placing the children in the permanent custody of LCCS, the trial court should have granted a six-month extension of temporary custody. Although they do not challenge the trial court's findings on the permanent custody test, this Court will first address those findings before reviewing the trial court's denial of the parents' alternative request for an extension of temporary custody.

{¶17} Before a juvenile court may terminate parental rights and award permanent custody of a child to a proper moving agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned; orphaned; has been in the temporary custody of the agency for at least 12 months of a consecutive 22-month period; the child or another child of the same parent has been adjudicated abused, neglected, or dependent three times; or that the child cannot be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) that the grant of permanent custody to the agency is in the best interest of the child, based on

an analysis under R.C. 2151.414(D)(1). R.C. 2151.414(B)(1) and 2151.414(B)(2); *see also In re William S.*, 75 Ohio St.3d 95, 98-99 (1996).

{¶18} In considering whether the juvenile court's judgment is against the manifest weight of the evidence, this Court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new [hearing] ordered." (Internal quotations and citations omitted.) *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. When weighing the evidence, this Court "must always be mindful of the presumption in favor of the finder of fact." *Id*. at ¶ 21.

{¶19} The trial court found that the first prong of the permanent custody test was satisfied because A.S. and S.S. could not or should not be returned to their parents' custody based on several alternative factors set forth in R.C. 2151.414(E). R.C. 2151.414(B)(1)(a). "[T]he trial court was required to find only one factor under R.C. 2151.414(E) to support its 'cannot or should not' determination under R.C. 2151.414(B)(1)[.]" *In re S.M.*, 2025-Ohio-34, ¶ 22 (9th Dist.). Consequently, this Court will review the trial court's findings on only one of those factors.

{¶20} Among the trial court's alternative findings, it found that the parents had "committed abuse as described in section 2151.031 of the Revised Code against the child[ren] or caused or allowed the child[ren] to suffer neglect as described in section 2151.03 of the Revised Code, and the court determines that the seriousness, nature, or likelihood of recurrence of the abuse or neglect" makes placement with their parents a threat to their safety. R.C. 2151.414(E)(15). The parents have not challenged that finding, which was fully supported by the evidence in the record.

{¶21} To begin with, the trial court previously found in its adjudicatory decision that both Mother and Father had either perpetrated abuse against each child under R.C. 2151.031 or

neglected them under R.C. 2151.03 by failing to prevent the ongoing physical abuse of the infant children. Neither parent objected to or appealed the adjudications of abuse and neglect, so those findings were established in this case and there was no need to relitigate them at the permanent custody stage of the proceedings. *See In re H.F.*, 2008-Ohio-6810, ¶ 18; R.C. 2151.414(A)(1).

{¶22} At the permanent custody hearing, LCCS presented additional evidence that, throughout this case, there had never been any indication that anything other than abuse of the children by Father and/or Mother could have caused their injuries. The parents had admitted that no one else had been alone with the children, yet neither of them would accept any responsibility for the children's injuries. Mother and Father were already aware that, several years ago, Mother lost custody of J.B. because of child abuse and her failure to accept any responsibility for that abuse. Despite being confronted throughout this case with medical expert opinions about the injuries to A.S. and S.S., and the juvenile court's adjudication of the children as abused and neglected, both parents continued to deny any knowledge about how their children were injured. LCCS and the trial court were reasonably concerned about the risk of future abuse, given that neither parent had accepted any responsibility for the repeated acts of abuse of their children when left in their sole care.

{¶23} The trial court also focused on the severity and nature of the children's injuries. The trial court had medical expert testimony that each child had suffered numerous broken bones at several points in time and that the parents had failed to seek timely medical treatment for them, except the most recent leg fracture of A.S. There was undisputed evidence before the trial court that the children's injuries, particularly their broken leg bones, would have caused them serious pain and would have been apparent to their caregivers. Nevertheless, Mother and Father left most of these injuries untreated. Given the totality of these circumstances, based on the undisputed

evidence in the record, the trial court reasonably concluded that A.S. and S.S. were at risk of further abuse and/or neglect if they were returned to their parents' custody.

{¶24} Next, the trial court found that permanent custody was in the best interest of A.S. and S.S. When reviewing the trial court's best interest determination, this Court focuses primarily on the specific factors set forth in R.C. 2151.414(D). *In re M.S.*, 2023-Ohio-1558, ¶ 25 (9th Dist.). The trial court was required to consider the statutory best interest factors, which include: the interaction and interrelationships of the children, their wishes, their custodial history, their need for permanence and whether that can be achieved without a grant of permanent custody, and whether any of the factors outlined in R.C. 2151.414(E)(7)-(11) apply. R.C. 2151.414(D)(1)(a)-(e); *see also In re R.G.*, 2009-Ohio-6284, ¶ 11 (9th Dist.). None of the factors set forth in R.C. 2151.414(E)(7) through (11) are relevant in this case.

{¶25} Throughout the nineteen months that this case was pending, the parents' interaction with young A.S. and S.S. was limited to three months of closely supervised, weekly visits. During that time, witnesses observed that there was no apparent bond between the parents and children. After the criminal court imposed no contact orders, Mother and Father had no contact with their infant children. By the time of the hearing, the parents had not seen A.S. or S.S. for more than 16 months of their 21-month lifetime.

{¶26} Because A.S. and S.S. were too young to express their wishes, the guardian ad litem spoke on their behalf. She opined that permanent custody was in the best interest of the children because the parents were not able to provide them with a safe and stable home.

{¶27} The custodial history of A.S. and S.S. had included the first two months of their lives living with their parents. During that time, they suffered abuse and neglect, which included the infliction of multiple bone fractures, for which they did not receive timely medical treatment

and likely suffered significant pain. The children spent the next 19 months of their lives in a temporary placement, in the same foster home, where they were thriving. They needed a legally secure permanent placement but neither parent could provide them with a stable home and LCCS had been unable to find any suitable relative who was willing and able to do so. The trial court reasonably concluded that the children would achieve stability by terminating parental rights and placing the children for adoption.

{¶28} In light of the evidence before the trial court that supported its permanent custody decision, this Court will next address the parents' argument that the trial court should have instead granted a six-month extension of temporary custody. They also assert a due process argument because the trial court did not explicitly rule on their request for an extension. "When a trial court fails to rule upon a motion, it will be presumed that it was overruled." *Georgeoff v. O'Brien*, 105 Ohio App.3d 373, 378 (9th Dist. 1995). Consequently, this Court will review the merits of the trial court's decision to overrule the parents' motion for a first six-month extension of temporary custody.

{¶29} The trial court had authority to grant a first six-month extension of temporary custody under R.C. 2151.415(D)(1) only if it found, based on clear and convincing evidence, (1) that the extension was in the best interest of the children, (2) the parents had made "significant progress on the case plan[,]" and (3) there was "reasonable cause to believe" that the children would be reunified with their parents or otherwise permanently placed within the extension period. The evidence before the trial court failed to establish any of the three statutory requirements for a six-month extension of temporary custody.

{¶30} As explained already, the statutory best interest factors supported finding a permanent home for these children, not extending temporary custody for another six months.

These children had virtually no relationship with their parents; the parents abused and/or neglected them when they had custody, and were still facing criminal charges at the time of the hearing; the guardian ad litem supported permanent custody, not an extension of temporary custody; the children needed permanency because they had been in the agency's temporary custody for most of their lives; and they were bonded with their foster family, who was interested in adopting them.

{¶31} Although both parents argue that they had substantially complied with the requirements of case plan, the main progress they made was by participating in some mental health treatment. The primary focus of the case plan was for the parents to visit the children and attend parenting classes with them to learn how to safely parent them. The parents did not interact with the children for most of this case because of the no contact orders in their criminal cases. Regardless of their reason for not making progress on this primary aspect of the case plan, the evidence was not disputed that they had not made the "significant progress" that was required for an extension of temporary custody.

{¶32} Finally, there was no evidence before the trial court that Mother or Father would have the ability to provide a permanent home for the children within a six-month extension period. They argue on appeal that they just needed more time to resolve their criminal charges. There was no evidence before the trial court, however, to demonstrate when the criminal charges would be resolved. Moreover, there was no evidence presented about whether the parents were facing potential periods of incarceration and, even if not, when or if the criminal court would terminate the no contact order. Consequently, the trial court did not have reasonable cause to believe that the children could be returned to their parents within the extension period.

{¶33} Because the evidence did not support the requirements under R.C. 2151.415(D)(1) for the trial court to grant a six-month extension of temporary custody, it did not err in denying the

parents' motions. Given the evidence before the trial court, it did not lose its way by placing A.S. and S.S. in the permanent custody of LCCS rather than extending temporary custody for six months. Father's first and Mother's second assignments of error are overruled.

## MOTHER'S ASSIGNMENT OF ERROR I

> LCCS FAILED TO ENGAGE IN INTENSIVE EFFORTS TO LOCATE AND IDENTIFY KINSHIP PLACEMENTS AS AN ALTERNATIVE TO THE PERMANENT DIVESTMENT OF MOTHER'S PARENTAL RIGHTS. THE TRIAL COURT'S FAILURE TO HOLD LCCS ACCOUNTABLE, BY FAILING TO DETERMINE, AT EVERY COURT HEARING, THAT LCCS HAD ENGAGED IN INTENSIVE EFFORTS TO IDENTIFY AND ENGAGE APPROPRIATE AND WILLING KINSHIP CAREGIVERS FOR THE CHILDREN PREJUDICED MOTHER'S RESIDUAL PARENTAL RIGHTS. IF THE KINSHIP CARE ACT WAS FOLLOWED, IT IS LIKELY THAT A KINSHIP CARE PROVIDER COULD HAVE BEEN IDENTIFIED. THIS FAILURE IS PLAIN ERROR.

{¶34} Mother's first assignment of error is that the trial court erred in granting permanent custody of the children to LCCS because the agency failed to comply with the Kinship Caregiver Act, as set forth in R.C. 2151.4115 through 2151.4122. Specifically, R.C. 2151.4116(A) provides that "[a] public children services agency . . . shall make intensive efforts to identify and engage an appropriate and willing kinship caregiver for the care of a child who is in . . . [the] [t]emporary custody of the agency[.] Notably, this statute does not apply to the final disposition of the children or the merits of the agency's motion for permanent custody, which is the issue before us on appeal. By its explicit terms, R.C. 2151.4116(A) applied to the placement of these children while they were in the temporary custody of LCCS. While the children were in its temporary custody, R.C. 2151.4116(A) required LCCS to make efforts to place them in kinship care rather than a foster home. Given that the statute explicitly applies to temporary placement of the children, "'[o]nce a child enters the permanent custody of a public children services agency, the question of whether the child should reside in foster care or with a kinship caregiver while the child is in the agency's

temporary custody becomes moot.'" *In re J.K.-S.*, 2024-Ohio-2053, ¶ 34 (6th Dist.), quoting *In re M.K.*, 2023-Ohio-3786, ¶ 42 (5th Dist.). *See also In re A.M.*, 2024-Ohio-1164, ¶ 62 (8th Dist.). Because R.C. 2151.2116(A) was not applicable at this late stage of the proceedings, Mother cannot demonstrate error, and her first assignment of error is overruled.

## FATHER'S ASSIGNMENT OF ERROR II

THE COURT ERRED IN CONSIDERING IN ITS DECISION FATHER INVOKING HIS FIFTH AMENDMENT RIGHT AGAINST SELF-INCRIMINATION[.]

{¶35} Finally, Father asserts that the trial court committed reversible error in the permanent custody judgment by referring to the fact that he asserted his privilege against self-incrimination and did not testify at the hearing. Father asserts that the trial court's reference to his failure to testify was a "negative inference" that caused him to suffer prejudice in the trial court's permanent custody decision. Father has not demonstrated that he suffered any prejudice, however.

{¶36} Assuming, without deciding, that the trial court erred by referring to Father's failure to testify, any error was harmless. There was overwhelming other evidence that, throughout this case, Father refused to admit that he had harmed his children or that he bore any responsibility for their injuries. There was evidence in the record about several prior occasions when Father *had* spoken to doctors at the hospital, LCCS staff, and he testified at the adjudicatory hearing. Each time he spoke or testified, Father refused to admit that either parent had abused the children but conceded that they had been the only caregivers for the children. He continued to offer explanations for his children's injuries that were determined by medical professionals to be implausible. Based in part on Father's prior statements, the trial court had already conclusively established in its adjudication of abuse that one or both parents had abused the children on multiple occasions.

**{¶37}** Because Father has failed to demonstrate prejudicial error, his second assignment of error is overruled.

### III.

**{¶38}** The parents' assignments of error are overruled. The judgment of the Lorain County Court of Common Pleas, Juvenile Division, is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellants.

SCOT STEVENSON
FOR THE COURT

HENSAL, J.
SUTTON, J.
CONCUR.

APPEARANCES:

ANITA A. LAMBERT, Attorney at Law, for Appellant.

LORIE K. BROBST, Attorney at Law, for Appellant.

ANTHONY CILLO, Prosecuting Attorney, and LEIGH S. PRUGH, Assistant Prosecuting Attorney, for Appellee.

MAUREEN SAVINO, Guardian ad Litem.